Mr. Freer and Mr. Freier. Okay. And Mr. Kimball. Take your time. May it please the court. My name is Harris Freier, and I'm court-appointing counsel for Appellant Plaintiff Stephen McDowell in this case. I would like to reserve five minutes for rebuttal. Fine. The district court misapplied the limited exception set forth in Scott v. Harris in the defendant's version of the facts when it held that the videotapes so blatantly contradicted my client's version of the facts that no reasonable jury could believe it. However, as this court explains in Patterson v. City of Wildwood, a court should not apply Scott v. Harris in cases such as this. I think the issue here, maybe it comes down to is, look, we have two videos. Yes. The one by the state, one by Mr. Broadway. And the court, it seemed, Judge Hayden, I believe, right? Yes, she did. What she said was that she didn't see anything in the videos that supported, in fact, that the videos blatantly contradicted Mr. McDowell's allegations that the officers were acting The videos don't tell the whole story or what? My argument is that the videotapes do not, the videotapes do not blatantly contradict Mr. McDowell, Mr. McDowell's version of the facts. So therefore, she made incorrect legal conclusions. And specifically, how is that? Specifically. For example, they were, they did what? They put him in a chokehold and he blacked out for a period of time, twisted his testicles, or what? Well, yes, Your Honor, all of those. They twisted his testicles, which the videotape does not, which the videotapes do not dispute. He alleges that he was kicked and punched. They tried to break his hand. They poked him in the head with a nightstick, all while he was restrained. Let's assume all of that occurred. Does that show, you've got a group called in, a special group for an extraction. Does that show, maybe it could, but how does it show that they acted maliciously and sadistically? Because, Your Honor, Mr. McDowell was restrained at the time. So what occurs is the extraction units are called in to try to bring Mr. McDowell and Mr. Cruz back to their cells, and Mr. McDowell immediately goes to the ground, says, I am not resisting. His hands are placed, he has, his hands are, he's handcuffed. He has, and while he's completely restrained and lying prostrate on the floor, it's at this point where Mr. McDowell alleges that he was punched, kicked, they tried to break his hand, and also while being restrained, they walked him to the corridor while one of the defendants had his arm around Mr. McDowell's neck, choking him. So it's not that... Yeah, I mean, I've seen that part. I didn't see the around the neck choking in such a way that it seemed to be out of line with what the protocols call for an extraction team. I mean, you can't help but look at what, your depiction of the facts and then watching this DVD, which we've all seen. I mean, I take it that your client says, I'm trying to get help from my cellmate, then what we see is them taunting the guards. I mean, they're lining up, they're trying to use pepper spray. They must know that they mean business. They're resisting that, and then finally when the door opens, they attack the guards. I mean, I know that doesn't give them the license to do whatever they'd like to your client, but still, I mean, you've got to restore order. Well, Your Honor, Mr. McDowell alleges that he was set up, that the videotapes begin after Mr. McDowell, Mr. Cruz have been locked out of the cell and when they know the extraction is going to occur. So the video shows Mr. McDowell, Mr. Cruz, known extractions about to occur, the inmates known extractions about to occur, and the guards know extractions going to occur. They're getting ready, but Mr. McDowell alleges that it's beforehand when he tried to help his cellmate, Mr. Cruz, out of the cell and the defendants opened the door, that afterwards they deliberately locked the door behind him, thereby preventing McDowell from going back into the cell. So I would, but I would also point, I would also say that's also immaterial as to what, as to the exact circumstances as to Mr. McDowell getting out of the cell. Obviously he was let out, but the point is that once he's on the ground restrained and not resisting, his allegations show excessive, show excessive force. There'd be no, there'd be no reason why a guard would want to twist his testicles if he's just lying there and not resisting. There's no reason a guard would want to put his arm around his neck. There's, these are things that would not be done unless for a sadistic and malicious purpose. Could you turn for a minute to the clothing incident? Yes. That causes concern. Now, oh, we don't have obviously videotaped of that, right? No, there is no, there is no videotape of Mr., of the nakedness. All that, at the end of... Who are you making the claim against, by the way? We're making the claim against... I mean, is there anybody you identified that, that subjectively acted with deliberate indifference with regard to that condition of confinement claim? Well, we make the claim against all of the individual, we make the claim against all the individual defendants in terms of which individual defendant did not provide him with clothes. I don't, Mr. McDowell is not... But I don't have, do you have any, I don't have any indication in the record where you actually identified an individual with regard to that particular claim, an individual defendant. And I do not know, I do not know, I do not think that Mr. McDowell was aware of which medical care and denied him grievance forms. But as to why nobody provides him clothes for two weeks, I'm not sure if Mr. McDowell or any prisoner would possibly be aware of where, of who's responsible for taking his clothes. Okay. And I think we've covered most of... There are allegations of material fact that need to be resolved by a jury. As to whether they, these particular, the extraction team operated indifferently or sadistically. Well, yes, on top of the videotape. Deliberate indifference, I should say. Maliciously, sadistically. Which, and I would say the videotape, very limited exception, Scott V. Harris, that only blatantly contradicts Mr. McDowell's version of the facts. And as I explained in the brief, there are just a number of improper inferences that the district court made regarding, based on the videotape. Once she adopted the video, once she said that the videotape blatantly contradicted Mr. McDowell's testimony, she then made a number of inferences that weren't even on the videotape. For instance, she excuses defendants using a nightstick against Mr. McDowell, which they deny. But she says, well, it wouldn't be a problem if they, even if they did it because they were using the right amount of force because that's what they perceived. Or that she talks about even the cavity search, which she describes Mr. McDowell's defendant said that no cavity search occurred. Although I don't think there's any claim that you've made with regard to that, correct? Well, it's part, it's another improper, just another improper inference that she is, that the district court is saying things that even defendants don't say. And saying that, well, there was a reason for it. And I think at the end of the day, this is a credibility, this has to be credibility. Are you bringing that up on appeal? It is mentioned in. That particular issue? It is mentioned in, as an improper inference in our brief regarding the cavity search. I wasn't sure, I don't recall that. I recall the three things that you mentioned before. The twisting of the hand or the twisting of the testicles. Well, those most demonstrate the excessive force, Your Honor. But that's just an example of the district court's zeal to try to find, to try to grant inferences in favor of defendants when Mr. McDowell is the non-moving party. I don't think Scott v. Harris grants the district court a license to usurp the normal standards for summary judgment. Let's just go back to the chokehold for a second. Yes. That's one we have a clear picture on the video, at least the prison video. What was incorrectly done with respect to the method by which the person was restraining Mr. McDowell around the neck when he was leading him toward the wall? Well, Your Honor, the policies of the prison specifically and the defendants have testified that chokeholds are limited to times when the defendants feel that either the inmate or their lives or other inmates' lives are in grave risk for serious harm. So you're asking me, so I guess it's more the idea of why do defendants need to put their arm around his neck? What are the protocols? You looked at those. Did they say that you're not supposed to do that or you can do it in certain circumstances? Yes, Your Honor, the protocols do specifically limit, they do specifically limit the chokeholds to, let me just. Do you have a record site? I've signed to JA-371-25 to JA-372-10. Similarly, the use of chokeholds to restrain an inmate is only appropriate if the officer's life is endangered. If an inmate were handcuffed and shackled, it would be appropriate for an officer to have his arm around the neck, and the staff had applied the proper restraint against the inmate, and that inmate continued to be aggressive to the point that the staff feels that the person is still endangering himself or others, and that's JA-374-5-22. So I just think that the fact that they're doing something that goes against defendants' own regulations is also something that a jury should hear, at least for the credibility of termination. Okay, thank you very much. Mr. Kempel. If it pleases the Court, Deputy Attorney General Thomas Kempel, on behalf of the New Jersey Department of Corrections in this matter, the District Court was correct in granting summary judgment on behalf of the officer defendants in this case, Your Honor. What about, let's say, the last point, which was it was seen from the video that the one thing that we do see was the chokehold. Was that chokehold in compliance with or in conflict with the protocols of the prison? The chokehold was, if in fact the chokehold did occur... You've seen the videotape, right? Yes, I have, Your Honor, several times. Well, there was a chokehold, was there not? Well, the officer had his arm around his neck, his DMH neck to restrain him, and then the inmate went to the floor. He's surrounded by the five officers at that time facing the wall, and he is lowered to the floor, and that's when the nurse first comes over thereafter and attends to the laceration or to cut over his eye. It's unclear from the video that a chokehold took place. The officers deny that they choked him, that they lowered him to the ground. I think we have to all remember that there was a great deal of mace. I think you can hear it. I mean, it's obvious from the tape, the audio on the tape, that a number of officers as well as the inmates and other inmates uninvolved were coughing. You're talking about other people's testimony. What is inconsistent? He says that he was choked until he became unconscious and went to the floor. Now, does the film tell us that that's not true?  No, it's not blatantly contradicted by it, but under Scott v. Harris, Scott v. Harris said you view the light, the videotape, the facts and the light depicted in the videotape, which Judge Hayden properly did. It also says you take the record as a whole in determining the summary judgment review when the video does exist, and based on the record as a whole, which... But it's based on the record as a whole, you have to assume the credibility of what the plaintiff has testified to under oath, don't you? Unless it's blatantly contradicted. The blatant contradiction is based on the summary judgment law that you have to be able to say no reasonable person could possibly believe, having seen the film, no reasonable person could possibly believe what he's sworn to. If a chokehold took place at that point, then it didn't violate the Constitution. There were two aggressive inmates, as the tape clearly depicts. They were still in the hallway. They still hadn't been searched yet. There was information that McDowell possibly had a shiv, and if the chokehold took place, it was proper. That's our position. Are there regs about this? Your officer just read from deposition testimony. That was deposition testimony of Lydell Beshare, Your Honor. Are there regulations about chokeholds? Not that I'm aware of. As to when you use a chokehold, there is no protocol in the regulations? Well, they can use a chokehold in a serious event where there's imminent danger to life and injury to the officers, Your Honor. But here, this person was subdued at that point. This was like at 101, when they were taking him to the wall, is that correct? They were taking him to the wall. He had been by the door for several minutes, and then they moved him toward the wall. He's got his arm around his neck. You can argue one way or the other whether that's a chokehold or not. I can stop right there. I mean, isn't perhaps a question for a jury that is there or is there not a chokehold? If there is, is it called for under the protocols of the prison? Well, as a matter of law, chokeholds aren't per se unconstitutional, Your Honor. I believe that's how a judge should... I'm just saying the way you can see this being presented to the jury is, was there a chokehold? If the answer is yes, was that chokehold called for under the protocols of the prison? Or are you saying that there are no protocols of the prison for when you do and do not apply a chokehold to a prisoner, even if you are part of an extraction team? I am not aware of any written protocols concerning the chokehold, Your Honor. They do have protocols for use of force against inmates. But standing here today, I can't cite to you a specific protocol dealing with chokeholds. I think it has to come down to the analysis that the district court used, in that whether the force was applied for a malicious or sadistic purpose, or whether it was applied in good faith to restore order and maintain order and security in the prison. The videotapes in this case, and I would just dispute what counsel for the appellant stated about it being a setup on the part of the DOC. If you viewed a videotape, you can see that the initial videotape was Broadway's videotape before the DOC videotapes were, before the officers had even arrived on the tier to do the cell extraction. And if it be a setup, it's our position that it was a setup on the part of the inmates, knowing that Broadway had smuggled in a video camcorder and was filming surreptitiously in order to possibly develop a video that would show officers exceeding their authority. So if the setup was on anybody's part, it would be on the part of McDowell and Cruz in this instance. Now the video here doesn't show what happened beneath the pile of officers. It doesn't show, you can... I mean, all you see, I mean, I didn't even see Russo getting hit. I just see him coming up and he's got blood on his nose, for example. I just didn't, we don't, there's a bunch of officers on him because he rushed toward them as they opened up the gate there. How does the video then blatantly contradict, if that's the test under Scott B. Harris, and it is, what McDowell alleges? How does it blatantly contradict? Well, McDowell alleges that he was kicked and punched and while you can't see, you can see McDowell's lighter prison garb at the bottom of the scrum, for lack of a better word. You do not see the officers raising fists and punching. You do not see the officers kicking. While McDowell does say he's not resisting, it's apparent from the video that the officers are manipulating their arms in a way, as the court is aware, each officer has a different part of the body to grab and you sell extractions. The shield man goes first, then you have two arm men and two leg men to take the individual down, and that's another matter I would contend, the counsel for the appellant said that he went down. He didn't go down, he was taken down because he was resisting the officers as they entered the tier and the officers had to take him to the ground. After he, McDowell, had defied verbal commands, they tried to use lesser degrees of force. I think that the video itself, while McDowell says he's not resisting, depicts officers still grappling trying to take him into custody, which corroborates what their testimony was at deposition. So in that aspect, I do say that the video, we do say that the video blatantly disputes McDowell's version of events as it blatantly disputes his version of events as to how this act transpired. We can't tell if somebody, for example, there was somebody twisting his testicle, or somebody was taking his hand and trying to do something else to him with respect to his hand, because he did say, you know, let his hand go or whatever. And he did say he was poked with a nightstick in the face, and we know that, there's confirmation of that in the film because his face is bloody when he comes up, right? Well, he has a laceration, yes, Your Honor. Whether that laceration was... or a reasonable fact finder could infer that all that blood came from being struck in the face as he said he was. Yes, but again, going back to the qualified immunity analysis, whether that force was maliciously, sadistically applied, or whether it was in a good faith effort to quell a prison fight, that's a security issue, as it was in this case, and as the district court found it was in this case, in the qualified immunity analysis, determining whether a constitutional violation had occurred. If you address the condition of confinement claim for a moment, there's one where, yes, there's a... how long he was not provided even underwear, we don't know because there is a dispute of fact there. What is the prison protocol for how long you can deprive a person of clothing? The protocol is once the inmate is returned to the cell naked right after he's been searched, which occurred in this instance, his clothing is returned to him. We don't have that on the video. What we have on the video is the two inmates returned to their cell, cell 312. You do see that there's bedding in the cell, there's a mattress, there's a pillow, there's toilets. The inmates are seated when the officers withdraw from the cell, and actually that's the end of the video. So we don't have what occurred after that. What we have... We testified that he had to watch the next shift, and his testimony was... If they had not had clothes, I would have noticed. No, but we have also the log support, Your Honor, which shows that their property was returned to them the following day. It's at... I don't have the exact site. Doesn't all that together create a genuine issue of material fact? Again, looking at the case law, and the Court referred to the Camp v. Brennan case, where it's not a constitutional violation to leave an inmate in a cell naked for a period of time that is consistent with the period of time that the record shows occurred here. Again, going back to the qualified immunity analysis, the District Court properly concluded that no constitutional violations had occurred here. Based on the video, the record as a whole, and the case law that exists. I asked you if, or asked Mr. Fryer, if there was a specific identification of any officer pertaining to the condition of confinement claim, and I don't think there was, and that might be fatal. The trouble is that the defender, the assurer, didn't raise this as an argument. So isn't it waived, even if there was, even if there is a problem with regard to not identifying a particular individual? Well, we haven't raised that argument, Your Honor, at this point, and there is no specific person identified in the pleadings with respect to the condition of confinement claims that I am aware of. Any further questions? No. Thank you very much. Mr. Fryer. Your Honor, I believe that a counsel for Pelley's testimony, sorry, his statement demonstrates why the video was inconclusive. He says no chokehold occurred. I watched it. I think a chokehold occurred. I'm not sure what Your Honors believe, but Mr. McDowell says it occurred. Defendants deny it occurred. This is the perfect type of issue that is for a jury to decide, not a district judge, or a matter on a summary judgment. If you get to a trial, part of what goes through a district court's mind when it's considering summary judgment is, does this case have a prayer of winning at trial? And I think that the court concluded, based on certainly the state video especially, that there's just no chance of winning at trial. The chokehold that you're talking about is, it looks like they're leading the person from a door toward a wall, and then at some point, for whatever, whether something happened, or maybe the argument of the state is that he was fainting. We don't know, but it looks here as if what the court is saying is, you just can't win at trial. And therefore, I'm going to grant summary judgment. I'm just going to put the case out of its misery right now. What is your response to that? Well, Your Honor, I would dispute that contention that we cannot win at trial. And I think at the end of the day, you have to let a jury decide. Let a jury watch the videotapes. Let them hear Mr. McDowell's testimony. Let them hear the other witness's testimony, all the defendant's testimony. Let them make the credibility determination when Mr. McDowell's testicles were twisted, when he was jabbed in the face with a nightstick, when he says he was punched and kicked. Well, the first question is whether something was twisted, whether he was punched in the face with a nightstick, or it just happened in the melee as they were doing the extraction. And it really seems like that. It almost seems like it's becoming a question by that point of damages, which is even further removed from. What damages? Well, in terms of how vicious these things occurred, at the end of the day, Mr. McDowell, his allegations were that. I certainly think the district court thought this, that there wasn't anything on the video that appeared to be completely out of line. Maybe things happened that weren't completely captured on the video. But, for example, the chokehold looks like something you've seen on TV many a time, and it looks here as the person just being led toward a wall, period. And it didn't look like he was forcibly trying to cut off oxygen to the brain, for example. He was just walking him from the door to the wall. But, Your Honor, that's a credibility determination. It has to be up to a jury to watch the video and listen to the testimony of both Mr. McDowell and the defendants, and then make the determination as to how much force was applied in the chokehold. The district court erred in using what's a limited exception, in which she wouldn't have to make inferences in favor of the non-moving party, and she used the videotape, therefore, as a way to grant these inferences, actually not only not in favor of Mr. McDowell, but they were in favor of the defendants. And at the end of the day, this usurps the fact-finder's role. Whether we win or lose before trial, that is really going to be up to the fact-finder. Thank you. You took this case pro bono, is that correct? Yes. Okay. Thank you very much. We are most appreciative of counsel who take cases pro bono. You did a fine job, an exceptional job, and not only appreciate having you here today, but look forward to perhaps having you here before us another time. Thank you to both counsel. Take the matter under advisement.